## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

WINFORD TRACY JUSTICE                  *

Plaintiff                              *

v                                      *          Civil Action Case No. JFM-11-266

WARDEN KATHLEEN GREEN                  *
DOCTOR GETACHEW
DOCTOR PAUL MATERA                     *
JAN WILLIAMS, R.N.
MELISSA HIXON                          *
CORRECTIONAL MEDICAL SERVICES
                                       *
Defendants

                                          ***

## MEMORANDUM

Pending is a prisoner civil rights complaint pursuant to 42 U.S.C. § 1983 filed by self-represented plaintiff Winford T. Justice ("Justice").  Motions to dismiss or, in the alternative, for summary judgment, have been filed by defendant Kathleen Green, Warden of Eastern Correctional Institution (ECF No. 18 ) and defendants Correctional Medical Services (CMS) [1], Inc., Asresahegan Getachew, M.D., Paul Matera, M.D., Jennifer Williams, R.N. and Melissa Hixon, R.N. (collectively  referred to as "Medical Defendants") (ECF No. 15).  Justice has filed two motions for summary judgment.  ECF Nos. 17 and 28.[2]  The matter is briefed and ready for disposition; a hearing is deemed unnecessary.  *See* Local Rule 105.6 (D. Md. 2011).  For reasons to follow, Warden Green's dispositive motion, treated as a motion to dismiss, shall be granted. The Medical Defendants' dispositive motion shall be treated as a motion for summary judgment

---

[1]  CMS currently operates under the corporate name Corizon, Inc. *See* http://www.corizonhealth.com.   For the purpose of this Memorandum, the medical contractor will be referred to as Correctional Medical Services ("CMS").

[2]  Plaintiff's  belated claim concerning medical care provided for his injured thumb will not be considered in this case. Plaintiff may, however, present this claim by filing a separate complaint.   This court expresses no opinion about the merits of this claim.

and granted as to CMS, Jennifer Williams, R.N., and Melissa Hixon, R.N. but denied without prejudice to renewal within twenty-eight days as to Asresahegan Getachew, M.D. and Paul Matera, M.D.   Plaintiff's motions for summary judgment (ECF Nos. 17, 23, and 28) shall be DISMISSED without prejudice and his motions for appointment of counsel shall be DENIED without prejudice (ECF Nos. 24 and 41).

## I.  FACTUAL BACKGROUND

Justice is an inmate at Eastern Correctional Institution.  He claims he is receiving constitutionally inadequate care for pain relief, incontinence, asthma, and psoriasis.  Complaint, pp. 3-4.  Specifically, he states that he has waited an inordinately long time for treatment for severe back pain and continuing incontinence.  He also avers he received inadequate treatment for cellulitis of his knee.  As relief, he requests an injunction compelling defendants to provide adequate medical care and send him to an off-site physician.   He also requests $30,000 in compensatory damages. *See Id*., p. 4.

Defendants' verified exhibits show that Justice has a history of chronic lumbar disc displacement, benign prostatic hypertrophy, psoriasis, gastroesophageal reflux disease and asthma.  Def. Ex A, ¶ 3 (affidavit of Paul Matera, M.D.).  Naprosyn, a non-steroidal anti-inflammatory medication ("NSAID"), and Ultram were prescribed to treat his pain.  On January 26, 2010, Justice informed Dr. Matera that NSAIDs did not help his pain significantly.  Dr. Matera then ordered a short course of Prednisone, a steroid, to reduce the inflammation that was causing the pain. *See id*. ¶ 4.

### A.  Pain Treatment

On April 27, 2010, Justice was examined by Dr. Matera in the Chronic Care Clinic.

Justice reported that he had done well on the Prednisone and his back pain was improving.

Plaintiff stated he had been suffering back pain for ten years and bilateral knee pain for five

years.  He indicated NSAIDs helped ease his knee pain.  Examination of Justice's lumbar spine

revealed muscle spasm and mild pain with motion.  Dr. Matera renewed the Naprosyn and

Ultram prescriptions, and advised  use of warm or cold compresses as needed, exercise, and

avoidance of heavy lifting and sports.  *See id.* ¶ 5.  On June 2, 2010, Dr. Matera renewed

Justice's prescription for Ultram, 100 mg. twice per day.

On June 22, 2010, after the medical department instituted a policy that inmates taking

Ultram, a narcotic,[3] could not hold a prison job, Justice informed the medical department that he

wanted to stop pain medication in order to keep his prison job.  *See id.* ¶ 6.

On June 26 and 28, 2010, Justice submitted sick call request forms in which he stated

he was unable to tolerate his pain, and asked to restart Ultram.  He indicated he would quit his

prison job if necessary.  Justice indicated that he was taking up to 2000 mg. of Naprosyn each

day, an amount far in excess of the amount prescribed, and attributed blood in his stool to the

Naprosyn.

On June 30, 2010, Frances Morthole, a nurse practitioner, evaluated Justice. Morthole

advised Justice not to exceed his prescribed dosage of Naprosyn.  Justice stated he wanted to

speak to Dr. Matera about taking Ultram and left the medical unit before Morthole could

complete the examination.   Morthole observed, however, no limitations of movement.  Justice

sat, stood and bent without difficulty. Def. Ex. A. ¶ 8.

On July 15, 2010,  Lino Quilo, M.D. evaluated Justice.  In his medical notes, Dr. Quilo

---

3  Patients prescribed narcotics are advised not to operate heavy machinery or perform other activities that could
pose a danger to them because of possible side effects of the medications such as drowsiness or dizziness.  Def. Ex.
A, ¶ 7.

wrote Justice had discontinued Ultram in June and was managing his pain with Motrin. Examination revealed some tenderness in the spine, but the straight-leg raising test was negative.[4] Dr. Quilo discontinued Justice's Ultram and Naprosyn and continued Motrin for pain. [5]

On August 10 and 11, 2010, Justice filed sick call request forms complaining of back pain and indicating that an outside doctor told Justice's sister that the metal in his spine might be the cause of his back problems.

On August 11, 2010, Peter Stanford, a physician's assistant, evaluated Justice, who rated his back pain as 12 on a scale of one to ten, with ten being the worst possible pain.

On August 24, 2010, Dr. Matera examined Justice for abdominal pain. Justice had been examined at Peninsula Regional Medical Center in Salisbury, Maryland and was diagnosed with pancreatitis. Justice told Dr. Matera that he was feeling better but continued to suffer severe abdominal pain and asked for Ultram. Dr. Matera attests that he did not tell Justice that he would prescribe Ultram. Def. Ex. A, ¶ 11. Justice, however, claims that Dr. Matera promised to prescribe Ultram for him and failed to do so. Complaint, p. 3, ¶ 16. Later that day, Justice filed a sick call request form indicating that Dr. Matera had prescribed Ultram for him. The form was received on August 26, 2010. A nurse told Justice that Dr. Matera had stated that he did not think Ultram was indicated. Def. Ex. A, ¶ 11.

On September 2, 2010, physician's assistant Crystal Swecker evaluated Justice for his complaints of severe pain. Justice was given a one-time dose of Nubain, a narcotic analgesic

---

[4]   A straight-leg raising test often trigger pain in patients with lumbar spine problems. Def. Ex. A. n. 2.

[5]   Defendants state that the Ultram and Naprosyn prescriptions were in effect until August 27, 2010 and were available to Justice if he chose to restart them. Def. Ex. A., p. 10.

which is given intramuscularly.  On September 6, 2010, Justice complained again of pain and requested more Nubain.  Sadisu Zachari, a licensed practical nurse, evaluated Justice, noting that he exhibited no sign of distress.  Nurse Zachari notified a physician's assistant who prescribed Tylenol.   Justice refused the Tylenol and accused medical staff of racism for refusing him additional Nubain.  Def. Ex. A, ¶ 12.

On September 28, 2010, Dr. Matera saw Justice and prescribed one month of Ultram for his abdominal and low back pain.  Justice was ordered to refrain from work, courtyard, and gym activity while taking Ultram.  Dr. Matera's notes state that when Justice was taken to court on September 2, 2010, he told the holding facility nurse that he had just had surgery for gallstones. As a result, the medical staff at the holding facility gave him two injections of Nubain.  Justice has not undergone gallbladder surgery.  A recent CT scan showed Justice's gallbladder and other abdominal organs were normal.  Def. Ex. A, ¶ 13.

On October 12, 2010, Justice stated that he wanted to work and refused his Ultram prescription.  On October 13 and 14, 2010, however, he filed sick call forms stating that he had quit his prison job and wanted to restart Ultram.

On October 14, 2010, Dr. Quilo evaluated Justice.  Dr. Quilo noted there was no observable medical cause to explain Justice's abdominal pain.  Justice was able to walk without difficulty. The prescription for Ultram was in effect until October 28, 2010, and Dr. Quilo reinstated that prescription.

On October 19, 2010, Nurse Jennifer Castanares observed Justice working on his tier. The correctional officer in Justice's housing unit told her that Justice did not want to lose his job and wanted to "sign off" on Ultram.   The Ultram was then discontinued.  Neurontin was instead

prescribed for pain relief.  Def. Ex A, ¶ 14.

On November 14, 2010, Justice filed a sick call request form indicating that he fell on or about November 11, 2010, after the amitriptyline made him dizzy.  He also complained of weakness in his right leg and back pain.  Nurse Melissa Hixon evaluated Justice.  She noted he was not walking with a limp and did not grimace as if in pain when sitting or standing.  Justice told her that he had not taken the medication since it was first prescribed for him.   Justice's Medical Administration Records for October and November 2010 show that he refused his evening dose of Neurontin and apparently did not take his prescribed amitriptyline. [6]  Nurse Hixon advised physician's assistant Stanford about Justice's medical concerns.

On November 21, 2010, Justice filed a sick call request form in which he asked to have his medications reviewed and stating that his medication had caused his fall.   On November 24, 2010, Justice told P.A. Stanford that amitriptyline made him dizzy and that he had fallen 45 minutes after taking the first dose.  Justice asked to restart Ultram.  Justice reported Neurontin was not helping him significantly and Ultram provided more consistent pain relief.   Stanford prescribed Ultram, 50mg. twice per day, for pain. Def. Ex. A., ¶ 16.

On November 30, 2010, Dr. Matera and Asresahegn Getachew, M.D., the CMS Regional Medical Director, evaluated Justice.  Examination revealed no tenderness of the spine, normal gait, and normal range of motion and reflexes.  Dr. Getachew approved continuing Ultram for Justice's pain.  Dr. Matera ordered a CT scan to assess the surgical hardware in Justice's lumbar spine and for any other lumbar conditions.  Def. Ex. A, ¶ 17.

On December 7 and 15, 2010, Justice submitted sick call request forms for worsening

---

[6]  Neurontin is an anti-epileptic medical used to treat chronic pain. Def. Ex. A, n. 3.  Amitriptyline is an antidepressant used to treat chronic pain. Def. Ex. A, n. 4.

back pain.  On December 28, 2010, Dr. Matera saw Justice who stated his back pain was moderate in intensity.  Justice expressed his desire to work and indicated he might sign off on Ultram.   Dr. Matera noted the CT scan was still pending.

On December 30, 2010, Justice submitted a sick call request asking for an increase in his Ultram.  He complained the dosage he was receiving did not alleviate his pain.  Defendants stated that Justice did not appear for his appointment at sick call on January 5, 2011.   P.A. Stanford reviewed Justice's chart and noted that on December 28, 2010, Justice told Dr. Matera his pain was controlled on the current dose of Ultram.  Dr. Getachew removed the restrictions on working, courtyard activity, and gym.  Def. Ex. A, ¶ 18.

On January 6, 2011, Justice filed a sick call request form again complaining his medication did not alleviate his pain.  He wrote a letter to Dr. Getachew on January 12, 2011 with the same complaint.  On January 13, 2011, Justice was given a CT scan.  The results showed no change when compared with the August 17, 2010 scan.   The January 13, 2011 scan showed the spinal hardware was intact and there was no significant narrowing of the spinal column ("stenosis').  Def. Ex. A, ¶ 19; *see also* ¶ 20.

On January 17, 2011, Dr. Quilo evaluated Plaintiff.  Plaintiff told Dr. Quilo that the Ultram dosage was insufficient.  Examination showed some back tenderness without other significant symptoms.  Dr. Quilo renewed the Ultram prescription at the same dosage for one month and referred Justice to Drs. Matera and Getachew for pain management.

On January 28, 2011, Justice asked to increase his Ultram because he was not getting any relief at his current dose.  On January 30 and 31, 2011 and February 1 and 7, 2011, he complained that his lower back pain had worsened and his entire spine and back of his head were

sore. On February 7, 2011, Justice told P.A. Stanford that pain was radiating down his leg.  P.A.

Stanford diagnosed the problem as sciatica and added Naprosyn to Justice's medication regimen.

Def. Ex. A, ¶ 21.

On February 9, 2011, Justice submitted a sick call request form in which he stated that

Dr. Matera had advised him not to take NSAIDS such as Naprosyn because they could cause

stomach bleeding.   On February 10, 2011, Dr. Quilo saw Justice and made no changes to his

medicines.

On February 28, 2011, P.A. Stanford told Justice that Dr. Matera had intended to also

increase his morning dose of Ultram to 100 mg.  In fact, Dr. Matera had not intended to increase

the dosage.  Def. Ex. A. ¶ 22.

On March 2, 2011, Justice filed a sick call request form inquiring why he needed to

submit the form when his Ultram was about to expire.  A nurse advised him that all patients on

Ultram needed evaluation on a continuing basis.  At that time, Justice's Ultram prescription was

in effect until June 10, 2011.  Exhibit A, ¶ 23.

On April 4, 2011, Nurse Hixon examined Justice for right knee pain and swelling.

Examination revealed the right knee was red and mildly swollen.   Justice was referred to P.A.

Stanford who evaluated Justice that evening.   Justice told Stanford that the problem had started

six days earlier when he ran out of psoriasis medication.   Stanford diagnosed cellulitis[7] of the

knee, lanced the lesions, and noted yellowish drainage.  He ordered Bactrim, an antibiotic, to

treat the infection and ice compresses.  Def. Ex. A, ¶ 24.

On April 11, 2011, Justice complained of "severe, burning, shooting, throbbing" pain in

his lower back.  P.A. Stanford evaluated Justice that same day.   The medical notes show an

---

[7]  Cellulitis is a skin infection.

8

improvement in the cellulitis.   Justice's right knee was slightly red, not hot, and was neither swollen nor tender.  Examination revealed lumbar spine tenderness, moderate pain with motion, and that Justice winced when turning his torso and moving to and from a sitting position. Further, Justice stated he wanted the hardware removed from his back or better control of his pain.  Justice asked to increase his morning dose of Ultram to 100 mg.  Stanford told Justice he would relay his pain medication request to the Chronic Care Clinic ("CCC") physician.  Def. Ex. A, ¶ 25.

On April 14, 2011, Justice complained that his knee remained swollen and the order for ice to treat his knee had not been extended.  On April 15, 2011,  P.A. Stanford reviewed the Justice's medical record and noted that because the cellulitis had resolved there was no need to extend the order for ice.  *See id*.

On May 12, 2011, P.A. Stanford saw Justice in the CCC for complaints of severe lower back pain during daytime.  Justice asserted his dosage of pain medicine was insufficient. Stanford increase the morning dose of Ultram to 100 mg.  Stanford also noted a pustular lesion on Justice's knee near one of the psoriatic lesions and took a fluid sample to culture.  No bacteria was subsequently found in the lesion.  Def. Ex. A, ¶ 26.   Justice counters that the initial culture on May 12, 2011 was taken with an expired culturette kit.  ECF No. 34;  ECF No. 25,  Def. Memorandum in Opposition to Plaintiff's First Supplement,  ¶ 1 (acknowledging the kit was expired).  Justice claims that his knee remained infected until October of 2011.  The knee turned black and blue and Justice had to be taken to the medical unit where he received antibiotics by injection.  ECF Nos. 34-36.

On May 16, 2011, Dr. Matera submitted a consultation request for a neurologist to see

Justice for his back pain. [8]  Def. Ex. A, ¶ 27.   Justice has informed the court that he was told on September 9, 2011 that his request to see a neurologist was denied.  ECF No. 33; *see also* ECF No. 9, Plaintiff's Supp. p. 1.

On June 2, 2011, Dr. Quilo tested Justice's sensory dermatomes[9] at his fourth lumbar and first sacral level.  The dermatomes were intact, but mildly diminished on the right side as compared to the left.  Justice exhibited no motor impairment of his legs and walked without assistance.  Def. Ex. A, ¶ 28.

B.  Incontinence

Defendants indicate that Justice first presented complaints of urinary incontinence in January of 2010.   At that time, the problem was attributed to an enlarged prostate, also called benign prostatic hypertrophy ("BPH") and Hytrin[10] was prescribed for his urinary problems.   He presented no complaint of urinary problems until May 24, 2010, when he indicated he was urinating frequently.  There was no complaint of incontinence.   Def. Ex. A, ¶ 29-30.

On May 24, 2010, Justice told P.A. Stanford  that he was voiding every twenty minutes and frequently had the sensation that his bladder was full.   Justice reported he was voiding up to fifteen times daily and five or six times at night.   Justice's most recent prostate-specific antigen ("PSA') test result and blood sugar were within normal range.   Stanford advised Justice to follow-up in two weeks. Def. Ex. A, ¶ 30.

---

[8]  Wexford Health Sources is the utilization review contractor for the State of Maryland.   Wexford reviews and approves all requests for on-site and off-site consultants for certain medical devices and other tests.   CMS is not affiliated with Wexford, nor does it have any control over Wexford's approval proves.   ECF No. 15, Defendants' Memorandum, n. 8.

[9]  A dermatome is an area of skin wher the sensory nerves all come from a single spinal nerve root.  ECF No. 15, Defendants' Memorandum, n. 9.

[10]  Hytrin (terazosin) is used to treat BPH sympoms. ECF No. 15, Defendants' Memorandum, n. 10.

Justice offered no further urinary complaints until August 10, 2010, when he submitted a sick call request stating that he had been incontinent of urine three times.  The next day, however, Justice told P.A. Stanford that he was urinating without difficulty and did not mention incontinence.  Def. Ex. A, ¶ 31.   No further urinary complaints were presented until December of 2010.

On December 7, 2010,  Justice filed a sick call request form complaining of incontinence.   On December 28, 2010, Justice told Dr. Matera that his urinary problems had been the same for six or seven years.  He denied loss of bladder control. Def. Ex. A, ¶ 32. Justice, however,  now claims his request for adult diapers was refused until two weeks later. Complaint, p.  3,  ¶ 16.

On January 6, 2011, Justice complained he was voiding every five minutes.  On January 8 and 10, 2011, he requested adult diapers and received 20 medium-sized adult diapers on January 15, 2011.   On January 28 and 30, 2011, Justice filed sick call request forms that he was losing bladder control more frequently.  On February 16, 2011, a neurology consultation was requested for Justice's back pain and urinary incontinence.  On January 29, 2011 and February 13, 2011, he received additional adult diapers.  Def. Ex. A, ¶ 33.  On February 18, 2011, Dr. Quilo ordered 30 adult diapers for Justice every two weeks.  Justice received additional diapers on March 6 and March 13, April 29, May 22, and May 29. Def. Ex. A, ¶¶ 34, 35, and 40.

On February 28, 2011, P.A. Justice reported that he used three to five diapers daily and he had been unable to control his bladder since falling on November 17, 2010.  On April 26, 2011,  Dr. Matera stated he would request a urological evaluation for Justice.

At Justice's April 26, 2011 evaluation, Jessica Cecil, a physician's assistant, recorded

11

that Justice was using three to five diapers daily and denied stress incontinence. [11] Further,

Justice complained about the metal in his back and pain that spread around his back to his groin

area.   Justice told Cecil he had changed his diaper one half-hour prior to his medical

appointment, and that it was wet but not saturated.   Examination showed a dry diaper and a

bladder that was neither distended or tender.   Def. Ex. A, ¶ 37.   Plaintiff was able to void

approximately 10 cc into a urinal.   His urine tested positive for trace amounts of blood and

protein.   P.A. Cecil prescribed Cipro, an antibiotic, for three days in case Justice had a urinary

tract infection.     Nurse Jennifer Daly catheterized Justice to obtain post-voiding residual urine,

which yield approximately 3cc of urine.     The catheter went into Justice's bladder without

resistance or complaints of pain.     Dr. Matera indicated a genitourinary examination and sexual

function history was needed for the neurology consultation request.   Def. Ex. A,¶ 38.

On May 12, 2011, Justice continued to complain of urinary incontinence.   He was not

wearing a diaper during his medical visit. His PSA test on May 13, 2011 was within normal

limits.  Def. Ex. A, ¶ 39.

Justice states on July 21, 2011, while in the process of changing his diaper, he suffered

severe lower back pain that caused him to lose his balance and fall, resulting in injury.

Plaintiff's Memorandum, ECF No. 27.   He states that since he was given Amitriptyline, and fell,

he has been incontinent and his condition is untreated.   Plaintiff's Memorandum, ECF No. 28.

C.  Other Conditions

Defendants' exhibits demonstrate that Justice has received Nasonex or Naserel nasal spray

and chlortrimeton for allergies.  He was prescribed an albuterol inhaler and flunisolide nasal

---

[11]   Stress incontinence is involuntary loss of urine during physical activity such as coughing or exercise.
ECF No.  15, Defendants' Memorandum, n. 11.

spray for his asthma.  On December 6, 2010, Justice submitted a sick call request form to refill

his flunisolide[12] spray and indicate that his allergies cause him to use his inhaler excessively.

On December 28, 2010, Dr. Matera examined Justice whose physical examination was

negative for wheezing, coughing, runny nose or other allergy symptoms.  On February 10, 2011,

Dr. Quilo renewed the albuterol prescription.  On March 3, 2011, Justice complained he had not

received his albuterol inhaler.  It was provided to him that same day.  Def. Ex. A, ¶ 42.

To treat Justice's psoriasis, he is given triamcinolone acetonide cream or fluocinonide

cream.   He was provided fluocinonide cream in July 2010, twice in February 2011, and in

March, April and May of 2011.  On September 10, 2010, he received triamcinolone ointment.

Justice presented no complaints about his psoriasis from January 2010 until February 2011.  On

February 10, 2011, he complained he had not received his psoriasis medication and his

fluocinonide prescription was renewed.  Def. Ex. A, ¶ 43.

## II.    STANDARD OF REVIEW

### A.  Motion to Dismiss

A motion to dismiss under Rule 12(b)(6) tests the sufficiency of the complaint. *See Presley v.*

*City of Charlottesville,* 464 F.3d 480, 483 (4th Cir. 2006).  A complaint need only satisfy the

standard of Rule 8(a), which requires a "short and plain statement of the claim showing that the

pleader is entitled to relief." Fed. R. Civ. P. 8(a) (2). "Rule 8(a) (2) still requires a 'showing,'

rather than a blanket assertion, of entitlement to relief." *Bell Atlantic Corporation v. Twombly*,

550 U.S. 544, 555 n. 3 (2007).   There must be more than "a formulaic recitation of the elements

of a cause of action" or "naked assertion[s] devoid of further factual enhancement." *Ashcroft v.*

---

[12]  Flunisolide is used to prevent and control symptoms caused by asthma such as wheezing and shortness
of breath. ECF No.  15, Defendants' Memorandum, n. 14.

*Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949 (2009) (internal marks omitted).

Further, the court must consider all well-pleaded allegations in a complaint as true, *see Albright v. Oliver*, 510 U.S. 266, 268 (1994), and must construe all factual allegations in the light most favorable to the plaintiff, *see Harrison v. Westinghouse Savannah River Company,* 176 F.3d 776, 783 (4th Cir. 1999) (citing *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir.1993)).  The court need not, however, accept unsupported legal allegations, *Revene v. Charles County Commissioners,* 882 F.2d 870, 873 (4th Cir.1989), legal conclusions couched as factual allegations, *Papasan v. Allain*, 478 U.S. 265, 286, (1986), or conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979).

### B.  Motion for Summary Judgment

Where the parties present matters outside of the pleadings and the court considers those matters, the motion is treated as one for summary judgment. See Fed. R. Civ. P. 12(b); *Gadsby by Gadsby v. Grasmick*, 109 F.3d 940, 949 (4th Cir. 1997); *Paukstis v. Kenwood Golf & Country Club, Inc*., 241 F. Supp.2d 551, 556 (D. Md. 2003).

A court may enter summary judgment only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). Summary judgment is inappropriate if any material factual issue "may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 250 (1986).

"A party opposing a properly supported motion for summary judgment 'may not rest

upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.' " *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir.2003) (quoting former Fed.R.Civ.P. 56(e)). "A mere scintilla of proof ... will not suffice to prevent summary judgment." *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249–50. (citations omitted).  The court must construe the facts that are presented in the light most favorable to the party opposing the motion. *See Scott v. Harris*, 550 U.S. 372, 378 (2007); *Emmett*, 532 F.3d at 297.

## III.   DISCUSSION

### A.   Warden Kathleen Green

Justice makes no specific allegation against Warden Green, nor asserts that she interfered with his medical treatment.  In the absence of any claim that Warden Green's conduct was improper or caused him injury, she is entitled to dismissal from this action.

Further, all medical decisions regarding the course of treatment for an inmate are made by private medical care providers employed by Correctional Medical Services, Inc.  ECF No. 18, Exhibit A, Declaration of Warden Kathleen Green.  Prison officials, including the Warden at ECI, do not have the authority to order medical providers employees to perform a particular treatment or direct their decision-making authority. *Id*.

### B.   Medical Defendants

The government is "obligat[ed] to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 102 (1976).  When prison officials  show "deliberate indifference" to a prisoner's "serious medical needs," their actions or omissions give

rise to an Eighth Amendment violation. *Id*. at 104.  The prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). The medical treatment provided must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.  *See Miltier v. Beorn,*  896 F.2d 848, 851 (4th  Cir. 1990). A defendant must know of and disregard an excessive risk to inmate health or safety.  "[T]he [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer v. Brennan*, 511 U. S. 825, 837 (1994).   Thus, a health care provider must have actual knowledge of a serious condition, not just knowledge of the symptoms.  *See Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998).   Mere negligence or malpractice does not rise to a constitutional level. *See Miltier v. Born,* 896 F.2d 848 (1990).   An inmate's disagreement with medical providers about the proper course of treatment does not support an Eighth Amendment cause of action. *See Wright v. Collins,* 766 F.2d 841, 849 (4th Cir. 1985); *Wester v. Jones*, 554 F.2d 1285 (4th Cir. 1977); *Russell v. Sheffer*, 528 F.2d 318 (4th Cir. 1975).

      1.  Correctional Medical Services

      Correctional Medical Services is a provider of contractual medical services to inmates at certain Maryland correctional facilities. To the extent the complaint names Correctional Medical Services based solely upon vicarious liability, a private corporation is not liable under § 1983 for actions allegedly committed by its employees when such liability is predicated solely upon a theory of respondeat superior.13  *See Austin v. Paramount Parks, Inc.,* 195 F.3d 715, 727-28 (4th

---

[13]  Respondeat superior is a legal doctrine whereby an employer may be held responsible for its employees.

Cir. 1999); *Powell v. Shopco Laurel Co.*, 678 F.2d 504, 506 (4th Cir. 1982); *Clark v. Maryland Department of Public Safety and Correctional Services*, 316 Fed. Appx. 279, 282 (4th Cir. 2009). Accordingly, there is no legal basis to hold CMS liable in this case. CMS will be dismissed as a party defendant.

        2.   Medical Practitioners

The exhibits provided by the remaining Medical Defendants, Asresahegan Getachew, M.D., Paul Matera, M.D., Jennifer Williams, R.N. and Melissa Hixon, R.N., show that Justice has been seen regularly by various CMS medical providers on-site to treat his conditions. Nothing in the record suggests the treatment provided by Defendants Jennifer Williams or Melissa Hixon to Justice amounted to deliberate indifference to his serious medical needs. Accordingly, summary judgment will be entered in favor Jennifer Williams and Melissa Hixon.

What is troubling, however, that the medical attention given to Justice does not appear to have alleviated his pain issues nor begun to address his continuing incontinence. The only "treatment" that Justice appears to be receiving for incontinence is the regular issuance of adult diapers. Justice's back condition appears to have worsened, resulting in at least one fall that caused him other injuries. Further, Justice has informed the court that Dr. Getachew denied his neurological consultation. Whether the urological consultation referenced in Defendants' exhibits was ordered by Justice's physicians or in fact ever took place and the results is unclear from the record.

Given the facts presented thus far, genuine issues of fact remain as to whether the remaining medical defendants' actions amount to deliberate indifference to Justice's known medical conditions and needs. It is unclear to the court whether Dr. Getachew or the utilization

review provider denied the neurological consultation and whether the urological consultation ever occurred.  Accordingly, the court will deny the remaining Medical Defendants' motion for summary judgment, subject to resubmission within twenty-eight days to include whether Justice has received recent urological and neurological consultations and the results.  Defendants are also instructed to indicate what treatment Justice is presently receiving for his back condition, pain management, urinary incontinence, and cellulitis.  After resubmission, the court will permit Justice to reply and may grant Justice an opportunity to amend his complaint to name Wexford Health as a defendant in this case and move for appointment of counsel.

## IV.    CONCLUSION

For the foregoing reasons, the court will grant Warden Green's motion to dismiss.  The Medical Defendants' Motion for Summary Judgment will be granted in part and denied in part without prejudice to refiling.  Summary judgment is entered in favor of Correctional Medical Services, Inc., Jennifer Williams, R.N., and Melissa Hixon, R.N.  Summary Judgment is DENIED without prejudice and subject to renewal within twenty-eight days as to Defendants Asresahegan Getachew, M.D. and Paul Matera. A separate order follows.


   February 2, 2012                                                  /s/
Date                                                       J. Frederick Motz
                                                           United States District Judge